On the Merits.
Years back — in the 80’s — defendant kept a store in Avoyelles. He failed in business. The circumstances attending his failure were not shown nor any act proven showing that a wrong was committed. We are informed that he failed in business, and that is all. He left the parish, and afterward engaged in business in the northern part of the state, and succeeded in gaining the confidence of a number of merchants who were willing to trust him. After some years, he again fell behind in business. He sought a respite from the court which was granted, but did not meet his obligations promptly under the terns of the respite. Creditors took steps to force him into insolvency. He succeeded in obtaining a compromise at 10 cents on the dollar and upwards, and obtained relief from his financial strait. He succeeded in re-establishing himself in business. Local merchants who commanded capital credited him. Some of the larger firms of Shreveport sold him goods and merchandise, thereby assisting him in carrying on his business as a merchant in one of the smaller towns or villages.
Several of the members of these firms who testified were not favorably impressed with the condition of his business soon after. They spoke of his dilatoriness in settling, and declined to continue business with him. He at about that time entered into negotiations with the plaintiff firm, Silbernagel & Co. The result was that he and the firm entered into an agreement in which plaintiffs bound themselves to make him an advance of $5,000, and defendant, on the other band, bound himself to ship them the cotton that he would buy within the year 1905.
That year, 1905, was not favorable. The cotton crop was short. A number of merchants were embarrassed in their business in consequence as well as planters. They were aided and carried over to another year — to-use the words frequently used by merchants- and planters.
The defendant, Eisher, was not, it seems, so-fortunate. Those who had advanced him showed no disposition to carry him for another year.
We have just mentioned that he had bound himself to ship the cotton he would buy to-the plaintiff firm; but, instead of so doing, he shipped to other firms, diverted his cotton away, and did not in that respect follow the-terms of his contract. When reminded by plaintiffs of his agreement, instead of showing a disposition to carry out his contract,, his conduct aggravated the situation. He was called upon by one of the employSs fora statement setting forth the condition of his business. This he at first refused to give. He changed his mind, however, and dictated a statement to the willing and perhaps zealous clerk of plaintiffs. At his instance, the dictated statement was handed to him by the clerk, and he subsequently refused to hand it back to the clerk.
He at about the end of the year (1905) conceived the idea of selling some of the goods-in his store at public auction.
Such a course on the part of the owners of a store in which goods are not usually sold at auction would cause inquiry anywhere, particularly in a small place in the country. It was something to give rise to the concern of creditors, and to influence them to call on-attorneys to institute proceedings.
The record, furthermore, disclosed that he-had some 10 or 11 mules that he shipped to-a small town in Mississippi to be sold for. cash. This shipment of mules by defendant excited some attention.
In accounting for his act in thus sending them away, he gave an account for the demand for mules and horses at the place to-which he had sent them, and mentioned the name of a man as authority for the statement that fair prices could be obtained for them.
*1085 This man, defendant’s informant, so defendant said, afterward became a witness in the ease, and denied that he had ever made the statement.
Defendant was heard to make remarks •about his intentions in regard to his business. He was at the time riding on a train. He was overheard. His remark was interpreted as an expression of his intention to protect himself from the successful pursuit of his creditors.
He gave mortgages on his property to asserted creditors. One of these mortgages was to his brother and the other to his nephew. This giving mortgages doubtless added to the suspicion already felt by his creditors that he was attempting to protect himself from the pursuit of his creditors.
On another occasion, after close dunning by plaintiff, he consented to part with a few hundred dollars.
Without entering particularly into details, the payment of the few hundred dollars was made under rather peculiar circumstances, not such as to inspire confidence. We will stop long enough to state in regard to this payment that plaintiffs through their employs sought to obtain a consignment of some cotton which he had. This was consented to, provided plaintiffs would bind themselves to let him have $800 of the proceeds. The cotton was shipped, but the defendant held on to it, and would not surrender it until the amount in question had been paid. The cotton was sold by plaintiffs, and brought a few hundred dollars, which went toward the credit of defendant’s account.
It was extraordinary that defendant should insist upon terms to deliver cotton which he had bound himself to ship.
Again, the attorney of the Arcadia Cotton Oil Company called on the defendant for a payment of a claim due that mill. When told by the attorney that he was selling his property and executing mortgages without paying his debts, his reply was that he was doing these things in order to pay his creditors; but, when the attorney asked him for something on account from the pro rata intended from these proceeds of sales and mortgages for creditors, he met with defendant’s flat refusal.
Defendant insisted always, and some of his witnesses testified, that his purpose in selling and mortgaging his property was to pay his creditors.
This must have had some influence on the jury, for they returned a verdict in his favor for a large amount of damages, to wit, $25,-000.
The testimony upon the subject did not convince the trial judge. After the verdict had been rendered, a motion for a new trial was made. The judge mildly expressed his disapproval of the verdict as follows:
“I stated the reasons for not granting the rehearing. [They] are these: If this was a court of last resort in these cases, J would not hesitate to grant the new trial asked for; but thinking likely that another jury would render as unsatisfactory a verdict against plaintiff as this is, and the cause having to go to the Supreme Court for settlement, the same having been tried and all the evidence having been taken that was necessary in the case, and feeling that the Supreme Court will correct any errors made by the jury in these cases as to the excessive damages and any other errors, and knowing it would finally have to go there, the new trial is overruled.”
In reference to the disposition of the property defendant’s conduct was one sufficient to sustain an attachment against him. For less cause, some attachments have been maintained. Here there is a series of causes, and, while some of them may have been explained away, others were not.
Although the court determined to dissolve the attachment, the foregoing facts were considered mainly, because they have bearing on the question of damages claimed by defendant (in reconvention).
The decisions upon the subject afford some light.
*1087 In one case the debtor declined to carry out 'his contract to completion, and threatened to dispose of the property under facts and •circumstances stated. It was held it came within the law applicable to fraudulent intent, and justified an attachment. Oil Company v. Matheson, 48 La. Ann. 1321, 20 South. 713.
In another case it was decided that the evi■dence did not justify a dissolution of the attachment, as it showed the debtor intended to dispose of his property. Wetherow v. Croslin, 24 La. Ann. 128.
The court says in part in another case all his conduct gave just cause for alarm. Boyd v. Labranche, 35 La. Ann. 287.
And, again, defendant’s conduct is unjustifiable. 48 La. Ann. 1321, 20 South. 713. While there were grounds for attachment for reasons hereafter stated, attachment should not have been sued for by plaintiffs.
We leave this branch of the case to take up another relating to the amount due' by •defendant to plaintiff. The total is made up as follows: Pour notes at $3,150.86; open account, ,$1,570.17. Total, $4,721.03, and interest on $1,000 from December 1, 1905, on $1,000 from November 1, 1905, and on $1,000 from October 1, 1905 — on each at 8 per cent. — and fee of attorney.
The verdict and judgment will have to be amended by reducing the amount of the last-mentioned sum, with 8 per cent, interest thereon, on $3,000 from the respective dates on which each note became due and exigible for said amount, and 5 per cent, interest on $1,570.17 from the date of the advance.
Plaintiffs had a right to bring suit for the pledged nóte and to recover amount thereon actually due. Insurance Co. v. Johnson, 117 La. 880, 42 South. 357; Rev. Civ. Code, art. 3170; Chaffe v. Whitfield, 40 La. Ann. 631, 4 South. 563; Mechanics’ & Traders’ Ins. Co. v. Lozano, 39 La. Ann. 321, 1 South. 608.
Having fixed the amount to which plaintiffs have a right, we will now fix the value of the property mortgaged. It is not always an easy matter to determine the value to be given to property. Experts differ, and it is only when it is evident that property, because of its revenues or for any other reason, has a value that a value can be approximately established. Here there is a great divergence in the estimate. We have concluded that the property mortgaged was worth about the amount due to plaintiffs. This conclusion is reached after deliberation. We are not of the opinion that further evidence will throw any light upon the subject.
Now, as relates to the amount of damages claimed by defendant, and which have been allowed by the jury: In our opinion it is excessive, and out of all reason. We cannot conceive for a moment under the facts and circumstances that defendant was damaged as he claims, or, at any rate, that he was damaged in a manner which gave him a right to recover a large amount of damages. It seems to us that in one sense the maxim, “Volenti non fit injuria,” applies to him. He does not appear to have sought to minimize the damages. Moreover, the attachment was rescinded in order of date.
Returning to the plaintiffs as relates to the attachment before referred to: The plaintiffs, being substantially secured by mortgage as to their claim, should not have obtained a writ of attachment. We have not found, however, that they acted in bad faith. It was an error in judgment.
Considering everything connected with the case, the amount must be limited to $1,000 in reeonvention for all damages.
Eor reasons stated, it is ordered, adjudged, and decreed that the judgment of the district court is amended by reducing the amount of the judgment from $5,000 to the sum of $4,721.03, with interest as before mentioned, and 10 per cent, attorney’s fee on the last-stated amount.
*1089 It is further ordered, adjudged, and decreed that the judgment appealed from as relates to defendant be, and' the same is hereby, amended by reducing the amount of damages to the sum of $1,000, with 5 per cent, interest thereon from the date of this judgment.
. It is 'further ordered, adjudged, and decreed that the writ of attachment is dissolved at the cost of plaintiffs, appellants, in the district court.
The defendant and appellee is condemned to pay the cost of the trial of the main demand in the district court.
The costs of appeal are divided equally. Each is condemned to pay half of the costs.